

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00383-CV

———————————————

FROST BANK AND FROST BROKERAGE SERVICES, INC., Appellants

V.

STURDI PACKAGING, INC.; STURDI FOREST, L.P., AS SUCCESSOR IN
INTEREST TO STURDI PACKAGING, INC.; AND CHEMCRAFT (PTY) LTD.,
Appellees

---

On Appeal from the 96th District Court
Tarrant County, Texas
Trial Court No. 096-340969-23

---

Before Kerr, Womack, and Walker, JJ.
Memorandum Opinion by Justice Walker

**MEMORANDUM OPINION**

This is an interlocutory appeal from an order denying arbitration in a lawsuit that arose from a dispute regarding the ownership of Sturdi Packaging, Inc. and its accounts with Frost Bank and Frost Brokerage Services, Inc. (collectively, Frost).

After receiving competing claims from Craig McAlpine and Chemcraft (Pty) Ltd. regarding Sturdi's ownership, Frost froze Sturdi's accounts and declared that they would "remain frozen until Frost receive[d] a court order" resolving the dispute or the parties reached an agreement regarding the accounts' ownership. In an effort to resolve the dispute to Frost's satisfaction, Sturdi and its successor in interest, Sturdi Forest, L.P. (collectively, the Sturdi Appellees), sued Chemcraft.[1] Although the Sturdi Appellees' original petition did not assert any substantive claims against Frost, it named both Frost Bank and Frost Brokerage as defendants "*in rem* only." Chemcraft, acting both on its own behalf and derivatively on behalf of Sturdi, filed counterclaims against Sturdi Forest and third-party claims against Craig.

After a successful mediation, the Sturdi Appellees, Chemcraft, and Craig announced that they had reached a confidential settlement agreement. But this settlement agreement did not end the litigation; it merely shifted its focus. Frost learned that, despite the settlement, the Sturdi Appellees did not intend to seek the dismissal of the entire lawsuit; rather, they planned to assert substantive claims against

---

[1]The Sturdi Appellees' lawsuit also included claims against Bernard Herbert, whose role in the ownership dispute will be discussed below.

Frost.  As a result, Frost anticipatorily filed a motion to compel arbitration and, subject thereto, an original counterclaim and crossclaim for declaratory relief.  Then, as Frost had anticipated, the Sturdi Appellees amended their petition to assert claims against Frost.  They later amended it again to assert new claims against Chemcraft for breach of the settlement agreement and fraud.

After a hearing, the trial court signed an order denying Frost's motion to compel arbitration of (1) the Sturdi Appellees' claims against Frost and (2) Frost's claims against the Sturdi Appellees and Chemcraft.  Because the arbitration provision at issue covers all of these claims and parties and because Frost has not waived the right to compel arbitration, we will reverse the trial court's order.

## I.  BACKGROUND

Chemcraft is a privately owned South African packaging and manufacturing company that was founded by Gilroy McAlpine, Craig's uncle.[2]  In 2006, Chemcraft was authorized to expand its packaging business into the United States by becoming the owner of the soon-to-be formed Sturdi.  In 2007, Sturdi was incorporated in Florida.  Chemcraft invested $3.5 million in exchange for a 100-percent equity stake in the new company and loaned it an additional $5.2 million to fund its operations.

---

[2]Gilroy established Chemcraft in 1973 and served as its sole owner until 1995, when he transferred his ownership interest to a family trust that he had established for the benefit of his adopted children.  He continued to serve as one of Chemcraft's two directors until his death in 2021.

Less than a year after its formation, Sturdi sought to move its business operations to Texas, and in May 2008, it filed an application to register as a foreign for-profit corporation with the Texas Secretary of State. This application listed Craig as Sturdi's president and registered agent.

Around this same time, Sturdi opened a commercial bank account with Frost Bank. This account is governed by a deposit account agreement (DAA) that contains an arbitration clause.

In 2015, Craig and Gilroy—on Sturdi's behalf—signed an application for a brokerage account with Frost Brokerage. Craig was named as the primary individual associated with the account, and Gilroy was named as an additional account holder. Chemcraft was listed as an "affiliated business." As part of this application, Craig and Gilroy acknowledged that the brokerage account—like the commercial account—was governed by a customer agreement (the BAA) that contained an arbitration clause.

In 2021, Gilroy died. Shortly thereafter, Bernard Herbert, the executor of Gilroy's estate and the trustee of the family trust that owned Chemcraft, began an audit and investigation into Gilroy's assets. As part of this process, Herbert asked Frost to provide him with a statement for Sturdi's brokerage account. Because Craig was the only authorized person on the account, Frost declined Herbert's request.

Relying on a stock certificate dated March 2007, Herbert maintained that Chemcraft owned all of Sturdi's stock, and he continued to seek access to Sturdi's accounts at Frost on that basis. But Craig claimed that he had purchased these shares

4

from Chemcraft in December 2011. Although Craig produced a fully executed Share Transfer Agreement, Herbert and Chemcraft denied that the stock purchase ever actually occurred.[3]

Throughout 2022, both Herbert and Craig attempted to assert control over Sturdi. In June 2022, Craig converted Sturdi, a Florida C-corporation, into Sturdi Forest, a Texas limited partnership.[4] Meanwhile, Herbert filed documents with the Florida Secretary of State listing him and his business partner as Sturdi's directors. During this time, Herbert continued to communicate with Frost in an effort to gain access to Sturdi's accounts, and he eventually set up a meeting at which he produced the 2007 stock certificate identifying Chemcraft as Sturdi's sole shareholder.

In February 2023, faced with Craig's and Chemcraft's competing ownership claims, Frost froze Sturdi's deposit and brokerage accounts. Its business operations

---

[3]In its pleadings, Chemcraft identified a number of factors that called the Share Transfer Agreement's legitimacy into question. For example, it pointed out that the Share Transfer Agreement was inconsistent with Sturdi's tax returns and Chemcraft's financial statements, both of which reflected Chemcraft as Sturdi's beneficial owner after 2011. Chemcraft further noted that the Share Transfer Agreement reflected that Gilroy was Chemcraft's "owner" even though Gilroy had transferred ownership of Chemcraft to a family trust well before the Share Transfer Agreement had purportedly been executed.

[4]According to the Sturdi Appellees, Sturdi elected to convert to a limited partnership "[t]o take advantage of more favorable tax treatment" and decided that the conversion should occur in Texas because that was where it conducted its business operations. But Chemcraft and Herbert deny the validity of this conversion and contend that it was part of Craig's "[f]raudulent [s]cheme" to obtain exclusive control over Sturdi to the exclusion of its sole shareholder—Chemcraft.

5

having been disrupted by the account freeze, Sturdi engaged counsel to help it regain access to its accounts. Numerous communications were sent between Sturdi's and Frost's attorneys. As part of this exchange, Frost's counsel sent an email confirming that Sturdi's "bank accounts [would] remain frozen until Frost receive[d] a court order determining the ownership of Sturdi . . . or there [was] an agreement as to the ownership of the accounts."

Shortly after receiving this email, the Sturdi Appellees filed a lawsuit against Chemcraft and Herbert. Frost Bank and Frost Brokerage were named as defendants "*in rem* only."[5] The Sturdi Appellees' petition included claims for tortious interference; trespass to chattels; and declaratory relief that, inter alia, Craig was Sturdi's sole owner. They also sought a temporary injunction requiring Frost to unfreeze Sturdi's accounts.

Chemcraft filed an answer and, acting both on its own behalf and derivatively on behalf of Sturdi, asserted counterclaims against Sturdi Forest and third-party claims against Craig. Chemcraft's affirmative claims included causes of action for fraudulent transfer, breach of fiduciary duty, conversion, and declaratory relief. Chemcraft also sought a temporary injunction preventing Craig from conducting business for Sturdi or using Sturdi's funds.

---

[5]The Sturdi Appellees' petition clarified that the Frost entities were named as defendants solely because they were necessary parties to the Sturdi Appellees' declaratory-judgment claim.

6

On March 24, 2023—before Frost's answer deadline—the trial court held a hearing on the Sturdi Appellees' and Chemcraft's competing requests for temporary injunctive relief. All parties—including Frost—agreed to a temporary restraining order (TRO) that continued Frost's hold on Sturdi's accounts except in cases where the Sturdi Appellees and Chemcraft agreed in writing to the sale of securities held in the brokerage account.[6]

In April 2023, Frost filed an answer in which it generally denied the Sturdi Appellees' claims and requested attorney's fees. Frost's answer expressly provided that Frost "[did] not waive [its] rights to compel arbitration under the [account] agreements."

Chemcraft proposed a Rule 11 agreement[7] to permit limited discovery in advance of a planned mediation. The agreement, which was signed by counsel for all parties on April 27, 2023, explicitly recognized that Frost would not be participating in the mediation. Thereafter, as contemplated by the Rule 11 agreement, Frost responded to a number of discovery requests; however, it did not propound any discovery of its own.

---

[6]Based on the parties' agreement, the trial court later signed an amended TRO delaying the temporary-injunction hearing until August 2023.

[7]*See* Tex. R. Civ. P. 11 (providing, in relevant part, that "no agreement between attorneys or parties touching any suit pending" is enforceable unless it is "in writing, signed[,] and filed with the papers as part of the record").

In July 2023, the Sturdi Appellees, Chemcraft, and Craig filed a joint motion to dissolve the TRO in which they announced that they had reached a confidential settlement agreement. The settlement agreement included joint wiring instructions authorizing and directing Frost to disburse funds from Sturdi's brokerage account. On July 14, 2023, the trial court signed an agreed order dissolving the TRO and directing Frost to disburse funds in accordance with the wiring instructions. Frost complied and disbursed the funds as directed.

According to Frost, after disbursing the funds, it learned that even though the Sturdi Appellees had settled their claims against Chemcraft and Herbert, they intended to assert substantive (i.e., in personam) claims against Frost. Accordingly, on August 10, 2023, Frost anticipatorily filed a motion to compel arbitration and, subject thereto, an original counterclaim and crossclaim for declaratory relief. Frost argued that the Sturdi Appellees could be compelled to arbitrate because they were parties to the BAA and the DAA, both of which contained broad arbitration provisions, and that Chemcraft could be compelled to arbitrate based on direct-benefits estoppel.

On August 15, 2023, the Sturdi Appellees did, in fact, amend their petition to assert claims against Frost, including conversion, trespass to chattels, breach of fiduciary duty, breach of contract, and negligence. These were the first in personam claims asserted against Frost, which, as noted, had been named only as an in rem defendant in the Sturdi Appellees' original petition.

8

Three days later, the trial court signed an order dismissing with prejudice "all claims by, . . . between[,] and among the Sturdi [Appellees], Chemcraft, [Craig], and [Herbert]" based on the parties' representation that all such claims "ha[d] been fully and finally resolved and settled." This order expressly stated that the Sturdi Appellees' claims against Frost remained pending.

On September 15, 2023, the Sturdi Appellees amended their petition a second time to add new claims against Chemcraft for breach of the settlement agreement and fraud. These claims were based on Chemcraft's failure to produce the cancelled original 2007 stock certificate pursuant to the settlement agreement's terms.

Less than two weeks later, the Sturdi Appellees filed a response opposing Frost's motion to compel arbitration. They argued that Frost's motion should be denied because (1) Frost had failed to establish that the claims at issue were within the arbitration agreements' scope; (2) Frost had waived its right to arbitration by substantially invoking the judicial process; and (3) Frost's declaratory-judgment claims against Sturdi and Chemcraft could not be arbitrated because Chemcraft had not signed any of the relied-upon arbitration agreements and thus had not agreed to arbitrate.

On October 2, 2023, Chemcraft filed its own response opposing Frost's arbitration motion. Like the Sturdi Appellees, Chemcraft argued that Frost had waived its right to arbitration by substantially invoking the judicial process and that Chemcraft could not be compelled to arbitrate because it had not signed the

9

arbitration agreements at issue. Additionally, Chemcraft argued that it could not be compelled to arbitrate under the direct-benefits-estoppel doctrine because it had never asserted a direct claim against Frost and had not sought any direct benefits under Sturdi's account agreements.

Following a hearing on October 4, 2023, the trial court signed an order denying Frost's motion to compel arbitration. This interlocutory appeal followed.[8]

## II. STANDARD OF REVIEW

We review a trial court's order denying a motion to compel arbitration for an abuse of discretion, deferring to the trial court's factual determinations if they are supported by the record. *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009) (orig. proceeding). But we review de novo the trial court's legal determinations, including whether the scope of the agreement encompassed the plaintiff's claims and whether a nonsignatory could be compelled to arbitrate. *Id.*; *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003); *Leland Pennington, Inc. v. Bulls*, No. 02-20-00282-CV, 2021 WL 832690, at *2 (Tex. App.—Fort Worth Mar. 4, 2021, no pet.) (mem. op.).

---

[8]Contemporaneously with its notice of appeal, Frost filed a motion requesting a stay of the litigation and a protective order preventing Frost from having to respond to discovery pending the outcome of this appeal. On October 20, 2023, the trial court signed an order granting Frost's motion and staying all litigation and discovery in this case.

A party seeking to compel arbitration must establish (1) that a valid arbitration agreement exists and (2) that it covers the claims at issue. *In re Dillard Dep't Stores, Inc.*, 186 S.W.3d 514, 515 (Tex. 2006) (orig. proceeding). If the moving party establishes these elements, "the trial court has no discretion to deny the motion to compel unless the opposing party proves a defense to arbitration." *Ferguson Braswell Fraser & Kubasta, P.C. v. SAF Oilfield I, LLC*, No. 02-22-00171-CV, 2023 WL 415616, at *2 (Tex. App.—Fort Worth Jan. 26, 2023, no pet.) (mem. op.) (first citing *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 753–54 (Tex. 2001) (orig. proceeding); and then citing *J.M. Davidson*, 128 S.W.3d at 227).

One such defense is waiver. *See Perry Homes v. Cull*, 258 S.W.3d 580, 589–90 (Tex. 2008). Whether a party's litigation conduct implicitly waives its right to compel arbitration is a question of law, which again, we review de novo. *In re Serv. Corp. Int'l*, 85 S.W.3d 171, 174 (Tex. 2002) (orig. proceeding); *In re Bruce Terminix Co.*, 988 S.W.2d 702, 703–04 (Tex. 1998) (orig. proceeding).

When, as here, the trial court does not specify the basis for its order denying arbitration, we must uphold the trial court's ruling if it is supported by any legal ground asserted below. *Leland Pennington*, 2021 WL 832690, at *5.

## III. DISCUSSION

The Sturdi Appellees and Chemcraft presented the trial court with three legal grounds to deny Frost's motion to compel arbitration: (1) that the dispute is outside

11

the scope of the arbitration provision at issue,[9] (2) that Frost waived its right to arbitrate by substantially invoking the judicial process, and (3) that Chemcraft—a necessary party to Frost's declaratory judgment counterclaim—is a nonsignatory and therefore cannot be compelled to arbitrate. Frost challenges each of these grounds on appeal, and we agree with Frost on all three.

## A. FROST'S CLAIMS FALL WITHIN THE ARBITRATION PROVISION'S SCOPE

The Sturdi Appellees[10] argue that the claims at issue are outside the arbitration provision's scope because (1) it applies solely to tripartite disputes involving not only Frost Brokerage and Sturdi but also National Financial Services, LLC (NFS), who is not a party to this case, and (2) the BAA's designated arbitral forum—the Financial Industry Regulatory Authority (FINRA)—is unavailable because Chemcraft is not a

---

[9]The Sturdi Appellees assert that Frost's counsel "stipulated" at the October 4, 2023 hearing that Frost had elected to pursue arbitration solely under the BAA's arbitration clause, not the DAA's arbitration clause. Following this supposed stipulation, the Sturdi Appellees nonsuited their claims against Frost Bank—the only Frost entity that is a party to the DAA. Based on Frost's purported stipulation and their nonsuit of their claims against Frost Bank, the Sturdi Appellees argue that the DAA's arbitration clause is no longer relevant to this appeal. Although we reject the Sturdi Appellees' contention that Frost stipulated that it would proceed to arbitration solely under the BAA and we question the Sturdi Appellees' contention that their nonsuit effectively eliminates the DAA's arbitration clause from consideration, because the DAA's applicability does not affect the final disposition of this appeal and because we have a responsibility to make our opinion "as brief as practicable," we will assume—without deciding—that the BAA's arbitration clause is the only relevant agreement for purposes of our analysis. *See* Tex. R. App. P. 47.1.

[10]Chemcraft did not address the arbitration provision's scope in its briefing before this court or the trial court.

12

FINRA member or a person associated with a FINRA member and because the FINRA Code purportedly precludes the arbitration of Chemcraft's derivative claims. These arguments are unpersuasive.

### 1. NFS's Absence Does Not Preclude Arbitration

The BAA's arbitration clause provides that:

> All controversies that may arise *between* [Sturdi], [Frost Brokerage,] *and* NFS concerning any subject matter, issue[,] or circumstance whatsoever . . . shall be determined by arbitration in accordance with the rules then prevailing of the Financial Industry Regulatory Authority (FINRA) or any United States securities self-regulatory organization or United States securities exchange of which the person, entity[,] or entities against whom the claim is made is a member . . . . [Emphasis added.]

Seizing on the clause's use of the word "and," the Sturdi Appellees argue that the arbitration provision applies only to tripartite disputes involving Sturdi, Frost Brokerage, and NFS. Based on this interpretation, they contend that the present dispute is beyond the arbitration provision's scope because NFS is not a party. But the Sturdi Appellees' narrow reading of the arbitration agreement fails to give effect to the BAA's other provisions and ignores the operative sentence's grammatical structure. *See Famous Water Co. v. Aquio Sols. Intermediate Holdings, LLC*, No. 02-23-00329-CV, 2024 WL 2971686, at *3 (Tex. App.—Fort Worth June 13, 2024, no pet.) (mem. op.) (noting that because "[a]rbitration agreements are interpreted under traditional contract principles," we must construe them as a whole "in an effort to harmonize and give effect to all . . . provisions so that none will be rendered

13

meaningless, and no single provision taken alone will be given controlling effect"); *see also TPG (Post Oak) Acquisition, LLC v. Greystone Multi-Family Builders, Inc.*, No. 01-18-00396-CV, 2021 WL 3870130, at *15 (Tex. App.—Houston [1st Dist.] Aug. 31, 2021, pet. granted, judgm't vacated w.r.m.) (mem. op.) (considering specific provision's grammatical structure when interpreting contract).

When the BAA is construed as a whole, it is clear that the arbitration agreement applies to two-party disputes involving some subset of Sturdi, Frost Brokerage, and NFS, not just to controversies involving all three parties. For example, Paragraph A of the arbitration agreement clarifies that "[a]ll parties to this agreement are giving up the right to sue *each other* in court." [Emphasis added.] Further, the BAA provides that by signing it, Sturdi agreed "to resolve disputes concerning [its] relationship with [Frost Brokerage] *or* NFS . . . through arbitration rather than a court of law." [Emphasis added.] Indeed, the very sentence upon which the Sturdi Appellees' narrow reading of the arbitration clause is based recognizes that arbitrable claims may be brought against "a *person*, *entity*[,] or entities." [Emphasis added.] Thus, the agreement clearly contemplates the arbitration of two-party disputes—those involving the claimant and the singular "person" or "entity" against whom the claim is made.[11] Given these provisions, we conclude that the arbitration

---

[11]The Sturdi Appellees contend that the phrase "between [Sturdi], [Frost Brokerage,] and NFS"—which they rely upon to support their narrow reading of the arbitration agreement as applying solely to three-party disputes—is a specific provision that should control over all others supporting a broader reading. But as

14

agreement is best read as applying to any disputes between or among Sturdi, Frost Brokerage, and NFS, not just those involving all three parties.

This reading of the arbitration agreement is reinforced by the use of the word "between" in the operative sentence. "[B]etween expresses one-to-one relations of many things." Bryan A. Garner, Garner's Modern English Usage 138 (5th ed. 2022) (emphasis removed). Thus, the phrase "between [Sturdi], [Frost Brokerage,] and NFS" suggests a series of one-to-one relationships, not just a singular relationship involving all three of the named parties. For example, if a sports analyst were to remark that "there have been a lot of trades between the Mavericks, Rockets, and Spurs over the years," the audience would not interpret this as referring strictly to trades involving all three teams. Rather, any basketball fan would understand that the analyst was referring not only to three-team trades but also to trades involving any two of the enumerated teams.

Having rejected the Sturdi Appellees' contention that the BAA's arbitration provision applies only to three-party disputes, we conclude that NFS's absence from

---

Frost points out, the rule giving controlling effect to specific provisions is one of harmonization, not negation, *see, e.g.*, *Mosaic Baybrook One, L.P. v. Simien*, 674 S.W.3d 234, 258 (Tex. 2023), and Sturdi does not explain how its strict, conjunctive reading of the relied-upon phrase gives meaning to any others. Further, as noted, the phrase "person, entity[,] or entities," which militates against the Sturdi Appellees' narrow reading, is contained in the very same sentence as—and is therefore just as specific as—the phrase that they claim should be given controlling effect.

15

this case does not place the claims at issue beyond the arbitration clause's scope. Thus, the trial court's order denying arbitration cannot be upheld on this basis.

## 2. The Trial Court's Order Cannot Be Upheld Based on FINRA's Potential Unavailability as an Arbitral Forum

The Sturdi Appellees also contend that the present dispute is beyond the arbitration provision's scope because the rules of the BAA's designated arbitral forum, FINRA, do not allow for the arbitration of shareholder derivative claims (such as those asserted by Chemcraft) or disputes involving a party who (like Chemcraft) is not a FINRA member or an associated person of a FINRA member. But because the Sturdi Appellees did not present this argument to the trial court, we cannot consider it as a basis for upholding the trial court's order denying arbitration. *See J.B. Hunt Transp., Inc. v. Lester*, No. 02-23-00035-CV, 2023 WL 3876758, at *8 (Tex. App.—Fort Worth June 8, 2023, no pet.) (mem. op.) ("Because [appellee] failed to present these arguments to the trial court, [she] cannot now raise these new arguments on appeal."); *see also Ferguson Braswell Fraser & Kubasta, P.C.*, 2023 WL 415616, at *3 ("When . . . the trial court does not specify the basis for its order denying arbitration, we must uphold the trial court's ruling if it is supported by any legal ground *asserted below*." (emphasis added)).

Further, even if the Sturdi Appellees had preserved this argument, it would not provide a valid basis for upholding the trial court's order. The Texas Supreme Court recognizes a distinction between substantive and procedural arbitrability questions,

16

and it has unequivocally stated that "[t]he availability of an arbitral forum is a matter of procedural arbitrability, which courts must allow arbitrators to decide." *Bonsmara Nat. Beef Co. v. Hart of Tex. Cattle Feeders, LLC*, 603 S.W.3d 385, 398 (Tex. 2020). Because the arbitrators will have the authority to determine whether the parties' claims are arbitrable under the FINRA rules, this forum-specific procedural gateway issue does not provide a valid basis for the trial court's decision to deny Frost's motion to compel arbitration. *See id.* at 398–99.

## B. FROST DID NOT WAIVE ITS RIGHT TO ARBITRATE

The Sturdi Appellees and Chemcraft argue that Frost waived its right to arbitrate by inducing, and then substantially invoking, the judicial process.[12] We disagree.

A party implicitly waives its right to compel arbitration if it "substantially invok[es] the judicial process" through "conduct inconsistent with a claimed right to compel arbitration." *Perry Homes*, 258 S.W.3d at 589–90; *Legoland Discovery Ctr. (Dall.), LLC v. Superior Builders, LLC*, 531 S.W.3d 218, 222 (Tex. App.—Fort Worth 2017, no pet.); *see G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 511–12 (Tex.

---

[12]The Sturdi Appellees alternatively argue that Frost waived its right to arbitrate by failing to first engage in mediation, a process that they characterize as a "prerequisite[] to arbitration." But this argument is based on the DAA's arbitration provision, which the Sturdi Appellees have argued—and we have assumed, *see supra* note 9—is not relevant. Accordingly, we need not consider this alternative waiver argument. In any event, because the DAA clearly states that if a party fails to mediate, its "only remedy is binding arbitration," it is evident that a party does not waive its right to arbitrate under the DAA by failing to engage in mediation.

2015). Whether a party's litigation conduct qualifies as "substantial" is a legal question and is determined on a case-by-case basis from the totality of the circumstances. *Perry Homes*, 258 S.W.3d at 590–91, 598; *see In re Nationwide Ins. Co. of Am.*, 494 S.W.3d 708, 713 (Tex. 2016) (orig. proceeding). "[K]ey factors include the reason for delay in moving to enforce arbitration, the amount of discovery conducted by the movant, and whether the movant sought disposition on the merits." *Richmont Holdings, Inc. v. Superior Recharge Sys., L.L.C.*, 455 S.W.3d 573, 575 (Tex. 2014).

The party opposing arbitration bears the burden to prove a substantial invocation of the judicial process, and because the law strongly favors arbitration, "this hurdle is a high one." *Perry Homes*, 258 S.W.3d at 589–90; *Legoland*, 531 S.W.3d at 222. It is so high that "appellate courts seldom find an implied waiver through litigation conduct," *Legoland*, 531 S.W.3d at 222, and the Texas Supreme Court has declined to find waiver even when the party seeking arbitration has, among other things, filed suit, moved to dismiss for lack of standing, moved to set aside a default judgment, removed the case to federal court, moved to strike an intervention, opposed discovery, requested an initial round of discovery, noticed and taken as many as four depositions, opposed a trial setting, and agreed to a trial resetting. *Perry Homes*, 258 S.W.3d at 590 (listing circumstances in which the court held that arbitration had not been waived).

Here, the Sturdi Appellees and Chemcraft argue that Frost first induced the judicial process by "demand[ing]" that Sturdi file suit to resolve the dispute regarding

18

its ownership and then substantially invoked that same process by "actively" litigating for five months, participating in discovery, and seeking affirmative relief. But these arguments are unpersuasive.

The Sturdi Appellees' contention that Frost "demanded" that they file suit is based on a mischaracterization of the March 6, 2023 email that they received from Frost's counsel. As noted, in this email Frost's counsel confirmed that Sturdi's accounts would remain frozen "until Frost receive[d] a court order" adjudicating Sturdi's ownership or "there [was] an agreement as to the ownership of the accounts." To support their contention that Frost essentially forced them to file suit, the Sturdi Appellees focus solely on the email's reference to a "court order"; they ignore the fact that Frost also indicated that it would unfreeze Sturdi's accounts if the parties reached an agreement regarding the accounts' ownership. Frost's mere mention of a court order as one option for resolving the ownership dispute to its satisfaction is not tantamount to a demand that the Sturdi Appellees file a lawsuit. In any event, Frost's statement that Sturdi's accounts would remain frozen until Craig and Chemcraft resolved their internecine dispute over Sturdi's ownership certainly cannot be fairly characterized as an invitation for the Sturdi Appellees to file substantive claims against Frost. Thus, we reject the Sturdi Appellees' argument that Frost induced them to file suit.

Further, considering the totality of the circumstances, we cannot conclude that Frost substantially invoked the judicial process. *See Perry Homes*, 258 S.W.3d at 590–

19

91, 598. The Sturdi Appellees and Chemcraft make much of the fact that Frost waited five months before seeking to compel arbitration. But delay alone—even a delay lasting much longer than five months—is not generally sufficient to establish waiver. *See Richmont Holdings*, 455 S.W.3d at 575 (noting that "mere delay in moving to compel arbitration is not [generally] enough for waiver" and holding that petitioner had not waived arbitration by litigating for nineteen months); *In re Vesta Ins. Grp.*, 192 S.W.3d 759, 763 (Tex. 2006) (orig. proceeding) (holding that "litigating for two years in the trial court" was alone insufficient to establish waiver); *Cooper Indus., LLC v. Pepsi-Cola Metro. Bottling Co., Inc.*, 475 S.W.3d 436, 452 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (holding that twenty-eight-month delay was insufficient to waive arbitration). And given the facts and circumstances of this case, we cannot conclude that Frost improperly delayed moving to compel arbitration to gain an unfair tactical advantage. *Cf. In re Multifuels, L.P.*, No. 01-09-00475-CV, 2010 WL 2723172, at *1 (Tex. App.—Houston [1st Dist.] July 2, 2010, orig. proceeding) (mem. op.) (Sharp, J., dissenting) (opining that the type of "prejudicial gamesmanship" in which "the party moving for arbitration reaps the benefits of litigation and then denies them to the non-moving party" in order to "gain an unfair tactical advantage" should not be permitted (internal quotations omitted)). The lawsuit started out as essentially a two-party dispute between the Sturdi Appellees and Chemcraft regarding Sturdi's ownership; although Frost Bank and Frost Brokerage were named as defendants "*in rem* only" in the Sturdi Appellees' original petition, no substantive claims were asserted

20

against them until after the Sturdi Appellees and Chemcraft successfully mediated their dispute. As little more than an interested spectator during the first five months of the lawsuit, Frost had no reason to seek to compel arbitration. But as soon as it became clear that the Sturdi Appellees and Chemcraft, having resolved their claims against each other, intended to file substantive claims against Frost, Frost moved to compel arbitration. Thus, Frost's delay can be attributed to the shifting dynamics of the litigation, not a desire to gain an unfair tactical advantage.

Nor was Frost's other litigation conduct inconsistent with its right to compel arbitration. Although Frost agreed to the entry of two TROs and sought a protective order to facilitate its production of documents containing confidential information, such conduct does not waive arbitration. *See G.T. Leach Builders*, 458 S.W.3d at 513 ("A party's litigation conduct aimed at defending itself . . . does not amount to substantial invocation of the judicial process."); *Transwestern Pipeline Co. v. Horizon Oil & Gas Co.*, 809 S.W.2d 589, 593 (Tex. App.—Dallas 1991, writ dism'd w.o.j.) (seeking protective order did not substantially invoke judicial process); *see also Turnbull Legal Grp., LLC v. Microsoft Corp.*, No. 01-20-00851-CV, 2022 WL 14980287, at *9, *15 (Tex. App.—Houston [1st Dist.] 2022, pet. denied) (mem. op.) (holding that appellant had not substantially invoked the judicial process even though it had, among other things, requested a TRO and a temporary injunction). Further, while the record reflects that Frost responded to written discovery requests, "[r]esponding to discovery . . . does not amount to waiver." *G.T. Leach Builders*, 458 S.W.3d at 514

21

(holding that the defendant had not waived arbitration by responding to discovery and noting that the court "ha[s] declined to find waiver even when the movant itself propounded written discovery"); *FW Servs. Inc. v. McDonald*, No. 04-19-00331-CV, 2020 WL 444400, at *3 (Tex. App.—San Antonio Jan. 29, 2020, no pet.) (mem. op.) (similar, quoting *G.T. Leach Builders*).

In sum, the Sturdi Appellees and Chemcraft have not carried their heavy burden to show that Frost waived its right to arbitrate by substantially invoking the judicial process.[13] Thus, the trial court's order denying arbitration cannot be upheld on that basis.

## C. CHEMCRAFT IS BOUND TO ARBITRATE UNDER DIRECT-BENEFITS ESTOPPEL

The Sturdi Appellees and Chemcraft also argue, as they did before the trial court, that Chemcraft cannot be compelled to arbitrate because it was not a signatory to the BAA. Although "[t]he involvement of a non-signatory is an important distinction because a party cannot be forced to arbitrate absent a binding agreement to do so," *Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 632 (Tex. 2018), Texas courts have recognized "six scenarios in which arbitration with nonsignatories may be required: incorporation by reference, assumption, agency, alter ego, equitable

---

[13]The Sturdi Appellees and Chemcraft also argue that they have been prejudiced by Frost's delayed attempt to compel arbitration. But because we hold that Frost did not substantially invoke the judicial process, we need not address the parties' arguments regarding prejudice. *See* Tex. R. App. P. 47.1; *Legoland*, 531 S.W.3d at 223 (similarly declining to address prejudice).

estoppel, and third-party beneficiary." *Apache Corp. v. Wagner*, 621 S.W.3d 285, 296 (Tex. App.—Fort Worth 2018) (mem. op.), *aff'd*, 627 S.W.3d 277 (Tex. 2021); *see Jody James Farms*, 547 S.W.3d at 633.

The question before us is whether direct-benefits estoppel requires Chemcraft to arbitrate its claims even though it did not sign the BAA. This doctrine is based on the principle that "a litigant who sues based on a contract subjects him or herself to the contract's terms." *FirstMerit Bank*, 52 S.W.3d at 755. A nonsignatory's suit is "based on a contract" if the nonsignatory "seeks, through the claim, to derive a direct benefit from the contract containing the arbitration provisions." *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 131 (Tex. 2005) (orig. proceeding) (quoting *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 741 (Tex. 2005) (orig. proceeding)). But, significantly, "a nonparty may seek or obtain direct benefits from a contract by means other than a lawsuit" as well. *Id.* at 132; *see Taylor Morrison of Tex., Inc. v. Ha*, 660 S.W.3d 529, 534–35 (Tex. 2023) (holding that nonsignatory spouse and children had accepted direct benefits from home purchase agreement by living in family home and could therefore be compelled to arbitrate).

In arguing that direct-benefits estoppel does not apply, Chemcraft emphasizes two points: (1) that it had not asserted any affirmative claims against Frost at the time that the trial court ruled on the arbitration motion[14] and (2) that its claims against

---

[14]Shortly after the trial court denied Frost's arbitration request, Chemcraft filed an amended petition asserting a myriad of claims against Frost.

23

Craig and the Sturdi Appellees purportedly did not seek direct benefits from the BAA or the DAA. While Chemcraft's first point is technically true, it is not alone dispositive. *Cf. Weekley Homes, L.P.*, 180 S.W.3d at 132 (holding that a party may seek or obtain contract benefits by means other than a lawsuit). And Chemcraft's second point is not supported by the record. Although Chemcraft may not have technically filed a claim against Frost, it sought and obtained contract benefits through both its prelitigation conduct and its claims for relief.

Before suit, Chemcraft—through its director Herbert[15]—repeatedly insisted that it be treated as an account owner under the BAA. Herbert requested access to Sturdi's brokerage account statements and sent a letter to Frost instructing it to give control of Sturdi's accounts to Sturdi's new directors that Chemcraft had purportedly elected. But under the BAA, Frost is obligated "to buy, sell, or otherwise dispose of securities" only for an account owner according to the owner's instructions. Similarly, the BAA contemplates the provision of account statements only to account owners. Thus, by insisting that it had the right to receive Sturdi's account statements and to direct the substitution of the authorized individuals or account holders associated with

---

[15]"Corporations can, of course, act only through agents of some character." *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391 (Tex. 1997) (internal quotations omitted); *see Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995) (recognizing that the acts of corporate agents—such as corporate officers and directors—taken on behalf of a corporation "are deemed the corporation's acts").

Sturdi's brokerage account, Chemcraft was, in essence, seeking benefits under the BAA.

Further, as part of the lawsuit, Chemcraft sought a declaration that it was entitled to "complete and total access and control over all of [Sturdi's] assets, including but not limited to its bank accounts at Frost Bank." In addition, it asked for a TRO freezing all of the Sturdi Appellees' assets.[16] And in settlement of Chemcraft's claims against the Sturdi Appellees, the trial court ultimately ordered Frost to unfreeze Sturdi's accounts and to distribute funds from the brokerage account to Chemcraft. Thus, Chemcraft not only sought contract benefits as part of the lawsuit, it actually obtained them.

Chemcraft also asserts that it cannot be compelled to arbitrate under the direct-benefits-estoppel doctrine because there is nothing in the record to show that it had actual knowledge of the BAA. *See Telsmith, Inc. v. 37 Bldg. Prods., Ltd.*, No. 02-19-00220-CV, 2020 WL 719445, at *4 (Tex. App.—Fort Worth Feb. 13, 2020, no pet.) (mem. op.) (discussing direct-benefits estoppel's knowledge element). But because Chemcraft did not raise this argument below, it cannot provide a basis for upholding the trial court's order denying arbitration.[17] *See J.B. Hunt Transp., Inc.*, 2023 WL

---

[16]We note that Frost's obligation to freeze the account in the event of an ownership dispute arises from the BAA.

[17]In its first amended counterclaim and crossclaim, Frost expressly alleged that Chemcraft had actual knowledge of the BAA and the DAA. Although Chemcraft quoted this allegation in its memorandum opposing Frost's motion to compel

25

3876758, at *8; *see also Ferguson Braswell Fraser & Kubasta, P.C.*, 2023 WL 415616, at *3. And even if Chemcraft had preserved this argument, we would reject it on the merits. The record reflects that in 2015, Gilroy—who served as one of Chemcraft's two directors until his death in April 2021—signed the brokerage account application in which he acknowledged that the account was governed by the arbitration clause in the BAA. Thus, Gilroy had actual knowledge of the BAA and its arbitration clause, and because he was one of Chemcraft's directors, this knowledge may be imputed to Chemcraft. *See Poth v. Small, Craig & Werkenthin, L.L.P.*, 967 S.W.2d 511, 515 (Tex. App.—Austin 1998, pet. denied) ("Knowledge held by corporate officers or directors may be imputed to the corporation itself." (citing *Hirsch v. Tex. Lawyers' Ins. Exchange*, 808 S.W.2d 561, 563 (Tex. App.—El Paso 1991, writ denied))).

Having rejected Chemcraft's arguments that it lacked actual knowledge of the BAA and did not seek or obtain direct benefits thereunder, we conclude that direct-benefits estoppel applies. Therefore, the trial court's order denying arbitration cannot be upheld on the grounds that Chemcraft was not subject to the BAA's arbitration provision.

## IV. CONCLUSION

Because the trial court's order denying arbitration cannot be upheld on any of the legal grounds asserted below, we reverse the order and remand the case for

arbitration, it did not deny that it had actual knowledge of the agreements or raise its lack of knowledge as a basis for denying arbitration.

further proceedings consistent with this opinion.  *See* Tex. R. App. P. 43.2(d); *G.T. Leach Builders*, 458 S.W.3d at 532 (similarly remanding); *Ferguson Braswell Fraser & Kubasta, P.C.*, 2023 WL 415616, at *13 (same).

/s/ Brian Walker

Brian Walker
Justice

Delivered:  March 6, 2025